**Alexandria**

CHARLES K. TATUM

v.

COMMONWEALTH OF VIRGINIA

No. 0222-92-4

Decided January 25, 1994

COUNSEL

John C. Youngs, for appellant.

Richard B. Smith, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

OPINION

**FITZPATRICK, J.**—Charles K. Tatum (appellant) was convicted in a jury trial of simple abduction in violation of Code § 18.2-48 and was sentenced to six months in jail and a fine of $2,500. On appeal, appellant argues that the trial court erred: (1) in allowing the father of the victim to testify that his caller ID device displayed appellant's telephone number during a telephone call from the victim made at the time of the abduction; and (2) in allowing the Commonwealth to impeach Dina Hashman, a defense witness, with an alleged prior inconsistent statement. Finding no reversible error, we affirm.

The events which led to the abduction charge began as a domestic quarrel between appellant and his girlfriend, Ms. Antoinette Orsini (the victim). On August 9, 1991, after a dinner engagement with two of appellant's friends, Dina Hashman and George Simpkins, the victim told appellant she wanted to go home to the residence she shared with her parents, rather than going home with him. The victim testified that appellant became angry and pulled his car to the side of the road where he verbally and physically abused her for nearly an hour.

After they arrived at appellant's home, he continued to assault the victim and instructed her to call her parents and tell them she would not return until the next morning. At approximately midnight, the victim called her father and said she was spending the night at appellant's home. At that time, she did not tell her father of the assaults, nor did she call the police, because she was afraid of appellant. The victim testified that appellant drove her home the following morning. She later reported the incident to the Arlington County Police Department.

Appellant denies abducting the victim. He testified that he brought the victim back to her parents' house immediately after the dinner party at Dina Hashman's house and then returned to Ms. Hashman's house where he spent the night. Both Ms. Hashman and George Simpkins testified that appellant and the victim left the dinner party together, and that appellant returned to their home alone and spent the night.

Joseph Orsini, the victim's father, testified that he received a phone call from his daughter at 12:01 a.m. on August 10, 1991. Over objection, Mr. Orsini testified that his caller ID device displayed the telephone number designating the origin of his daughter's call. The telephone number displayed was subsequently identified as appellant's telephone number.

Mary Orsini, the victim's mother, testified that her daughter returned home at approximately 8:30 a.m. on August 10, 1991. At that time, Mrs. Orsini saw her daughter get out of a green BMW driven by appellant. Mary Orsini also observed marks and bruises on her daughter's neck and face when her daughter returned home.

Arlington County Police Officer Steven Missouri testified that prior to trial appellant told him that he and the victim left the dinner party and went to his house, where they spent the night together. The next morning, appellant took the victim back to her parents' house.

During the Commonwealth's cross-examination of Ms. Hashman the prosecutor asked her if she had ever been convicted of a crime of moral turpitude. Ms. Hashman answered, "[t]here was an incident in Los Angeles, maybe a few years ago that there was a charge of me for — it was a misdemeanor and it was dropped." The prosecutor then attempted to impeach Ms. Hashman with a prior inconsistent statement. Defense counsel objected on the basis that the prosecutor was asking about a collateral matter. The trial judge overruled the objection. The prosecutor then asked, if prior to the trial, Ms. Hashman had told him

that she had never been arrested. Ms. Hashman stated that she had said no at that time because the case had been dropped. The prosecutor did not attempt to introduce evidence of the conviction.

## ADMISSIBILITY OF EVIDENCE OF A "CALLER ID" DISPLAY

■ This is an issue of first impression in Virginia. Appellant argues that Mr. Orsini's testimony regarding what was displayed on his caller ID device constituted inadmissible hearsay. We disagree. "Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." *Stevenson v. Commonwealth,* 218 Va. 462, 465, 237 S.E.2d 779, 781 (1977) (quoting *McCormick on Evidence* § 246, at 584 (2d ed. 1972)). In this case, there is no "out-of-court asserter," because the caller ID display is based on computer generated information and not simply the repetition of prior recorded human input or observation.

■ In *Penny v. Commonwealth,* 6 Va. App. 494, 370 S.E.2d 314 (1988), a case involving the admissibility of a telephone "call trap" report, we held "that the admissibility of the computer generated . . . results are more appropriately analyzed as a scientific test." *Id.* at 498, 370 S.E.2d at 316. We find the *Penny* analysis dispositive of the evidentiary issue raised in this appeal. The factual and legal similarities of *Penny* and the case at bar are apparent. For example, as in *Penny:*

> there exists no out-of-court declarant who could be subject to cross-examination. The scientific advances of modern technology have enabled the [caller ID] device to make and record the occurrence of electronic events. No human entered into the [caller ID] device the conclusion that the phone in [appellant's] residence had completed a contact with the phone in [Mr. Orsini's] residence. Therefore, the [caller ID's] reliability does not depend on an out-of-court declarant's veracity or perceptive abilities, and no cross-examination could occur which would enhance the truth-finding process.

*Id.* at 498, 370 S.E.2d at 317.

■ Finding no error in the trial court's overruling of appellant's hearsay objection, we now address the issue of the reliability of the caller ID device. In *Penny,* we held "that the call trap results may be

admitted only after the particular device in question has been proved reliable." *Id.* at 499, 370 S.E.2d at 317. We noted, however, that because the call trap is specifically "employed for the purposes of litigation and during the competitive process of ferreting out criminal agents, the added check [of reliability] is needed." *Id.* at 500 n.3, 370 S.E.2d at 317 n.3.

In this case, Mr. Orsini testified that he recognized the number displayed on the caller ID as appellant's home phone number. He had previously received other calls from that same number when appellant would identify himself and ask to speak to his daughter. Mr. Orsini was able to recall specific dates and times that he received telephone calls from appellant and the same number appeared on his caller ID device.

On direct examination, Mr. Orsini testified, in part, as follows:

A. I went to answer the phone and I press [sic] this caller ID. I do that automatically. This happened to be Saturday morning, [12:01]. The 10th of August.

Q. And did you happen to write down that number?

A. I did. I have notes on that. I do that instinctively every time I get a call at that hour of the evening. It happened to be [12:01] in the morning, Saturday, the 10th of August. And my daughter was on the phone.

Q. Do you recall from the caller ID what number?

A. Yes, sir. It was a Maryland number, 301, 248-[****]. And that happens to be a Maryland number, same number I received a call —

* * * * * * *

Q. Now when that caller ID number came up did you recognize it?

A. I recognized it was a Maryland number.

Q. Did you recognize the number from —

A. Yes, sir, I did.

Q. How did you recognize it?

A. Because I had received previous calls. One was on the — I received a previous call on July the 13th, it was a Saturday, at nine-eighteen a.m. and Mr. Tatum was on the phone calling my daughter. I also received another call on the same line —

\* \* \* \* \* \* \*

Q. Did you recognize the voice?

A. I recognized it after he gave his name. He gave his name, this is Mr. Charles Tatum. And I recognized that voice from a previous conversation on Mother's Day, May the 12th.

Q. What happened on May the 12th?

A. He asked for my daughter.

\* \* \* \* \* \* \*

Q. Did you have the caller ID on then?

A. Caller ID was there —

Q. What came up on —

A. Same number. This was a Maryland number.

From this evidence, the trial court properly found that the particular caller ID device attached to Mr. Orsini's telephone line was reliable. Accordingly, we find that the trial court did not err in allowing the Commonwealth's witness to testify concerning the number that was displayed on his caller ID device. This evidence was offered to show where the call originated and was corroborative of the victim's testimony that she telephoned her parents from appellant's home.

## IMPEACHMENT BY PRIOR INCONSISTENT STATEMENT

Appellant contends that the trial court erred in allowing the Commonwealth to impeach Ms. Hashman with an alleged prior inconsistent statement, because it involved collateral matters not raised on direct examination. *See Allen v. Commonwealth,* 122 Va. 834, 842, 94 S.E. 783, 785-86 (1918). During the Commonwealth's cross-examination of Ms. Hashman, the following exchange transpired:

Q. Ms. Hashman, have you ever been convicted of a crime of moral turpitude; that's defined as a crime of lying, cheating or stealing?

A. No.

Q. Never?

A. Lying, cheating —

Q. Have you ever been convicted of a crime of lying, cheating or stealing?

A. There was an incident in Los Angeles maybe a few years ago that there was a charge of me for — it was a misdemeanor and it was dropped.

Q. Isn't it a fact that you were convicted of a misdemeanor?

A. I don't know the legal terminology, I really don't so — it was dropped. To my knowledge, to my —

\* \* \* \* \* \* \* \*

Q. Ms. Hashman, do you recall the middle of last week you came in and spoke with Detective Moore and me?

A. Uh-huh.

Q. Do you remember that?

A. Yes, I do.

\* \* \* \* \* \* \* \*

Q. And at the end of the conversation both Detective Moore and I asked you point blank had you ever been arrested for something other than —

. . . [Defense counsel objected and bench conference took place at which time the trial court overruled the objection]

Q. I asked you and Detective Moore asked you had you ever been arrested or convicted. What did you answer?

A. If I remember correctly I said no to you because at that moment the cases were dropped, and I didn't —

The Commonwealth never admitted into evidence any certified convictions.

■ It is well settled in Virginia that whenever a witness testifies, his or her credibility becomes an issue subject to cross-examination. *Adams v. Commonwealth,* 201 Va. 321, 326, 111 S.E.2d 396, 399 (1959). Therefore, the Commonwealth was permitted to inquire of the witness whether she had ever been convicted of a crime of moral turpitude. *See Parr v. Commonwealth,* 198 Va. 721, 724, 96 S.E.2d 160, 163 (1957). However, "[a] witness may not be cross-examined regarding any fact irrelevant to the issues on trial when that cross-examination is for the mere purpose of impeaching his credit by contradicting him." *Simpson v. Commonwealth,* 13 Va. App. 604, 606, 414 S.E.2d 407, 409 (1992) (citations omitted). We find, under the facts of this case, that whether Ms. Hashman had ever been arrested for a crime is a collateral matter and the Commonwealth's cross-examination in this regard was improper.

Notwithstanding such error, we conclude that, after considering Ms. Hashman's entire testimony, in conjunction with the complete record, the portion of the Commonwealth's cross-examination that was improper had no impact upon the verdict in this case. Indeed, neither counsel mentioned the cross-examination in the closing arguments, and Ms. Hashman explained that the minor inconsistency, if any, was based on her belief that the California charge had been "dropped." Accordingly, we find the error harmless.

■ "The crux of the harmless error analysis is whether the defendant received a fair trial on the merits and substantial justice has been achieved." *Timmons v. Commonwealth,* 15 Va. App. 196, 199, 421 S.E.2d 894, 896 (1992). In Virginia, non-constitutional error is harmless when " 'it plainly appears from the record and the evidence given at the trial that' the error did not affect the verdict. An error does not affect a verdict if a reviewing court can conclude, without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same." *Lavinder v. Commonwealth,* 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (*en banc*) (citation omitted). We hold that the evidence presented in the case at bar satisfies the harmless error standard set forth in *Lavinder.* Thus, for the reasons set forth above, we affirm the judgment of the trial court.

A clerical error appears in the trial court's final order of February 5, 1992. The order erroneously indicates that the trial court "does hereby find the Defendant 'Guilty' of 'Simple Assault' as charged in the indictment herein." The indictment of October 21, 1991, charged appellant with abduction with intent to defile. The jury returned a verdict in

open court as follows: "[w]e, the jury, find the Defendant guilty of simple abduction as charged in the indictment and fix his punishment at six months in jail and a fine of $2,500." We remand the matter to the trial court for the sole purpose of correcting the clerical error in the trial court's final order.

*Affirmed.*

Moon, C.J., and Elder, J., concurred.